pointment conferred by another. Hutton v. Benkard, 92 N. Y. 295; Lockwood v. Mildeberger, 159 N. Y. 182, 53 N. E. 803. Were not the will to be construed as technically exercising the power of appointment, what difference would it make? It mattered not to the testator whether he gave the property to his beneficiaries, because of an unlimited power to dispose by way of appointment from another, or because he was exercising his own right to dispose of his own property. He gives this part of his estate, in explicit terms, to the father, sister, and trustee for the poor. There is nothing in the evidence or in the will or deed of trust which signifies the slightest probability of such a misconception in the source of his power to dispose of this property as would have changed the plan of the benefits he wished to confer by his will. The vital, substantial thing he was resolved to do, and which he executed in the solemn form by which an instrument made in view of death is executed, was to leave his property to the beneficiaries named, in the manner and form which his judgment had determined. He knew that he was enjoying this one-third part of his mother's estate, that he had the power to dispose of that one-third part, and that he had fully determined what he wished to do with it. How, then, can any court set aside his testament as ineffective, even if it called his execution of a power of appointment defective? And what is there to prevent the execution of his wishes by the construction that he disposed of this estate, even though it were not the proper execution of a power of appointment?

Let judgment be directed declaring that Henry Chauncey and Lucy Chauncey each take for life one-half of the property referred to in the second division of the will, the share of the one dying to go to the other for life, and the whole to pass upon the second death to the New York Life Insurance & Trust Company, trustee, to carry out the purposes indicated in the fifth provision of the will. Judgment accordingly.

---

(54 App. Div. 284.)

### CLEARY v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, First Department. November 9, 1900.)

1. **APPEAL AND ERROR—QUESTIONS REVIEWABLE.**

Where a brakeman sued for an injury received in coupling cars, and the fact that the cars did not have automatic couplings, as required by Laws 1893, c. 544, § 3; Laws 1890, c. 565, § 49, subd. 4; Pen. Code, § 424, subd. 2; 27 Stat. 531,—was not relied on or called to the attention of the trial court, it will not be considered on appeal.

2. **MASTER AND SERVANT—ASSUMPTION OF RISK.**

Plaintiff was injured while attempting to couple cars having drawheads of an uneven height. He testified that when he saw the moving car approaching he noticed that the drawheads were uneven, and that the link was in the lower drawhead, and that he thought he could avert the danger and couple the cars. When he attempted to raise the link, he found that the drawhead had a lateral movement, but this was not shown to have effected the injury. *Held*, that plaintiff had assumed the risk by attempting to couple such cars, and could not recover for an injury received while so doing.

Appeal from trial term.

Action by William H. Cleary against the Long Island Railroad Company for injuries. From a judgment dismissing the complaint, and from an order denying a motion for a new trial, plaintiff appeals. Affirmed.

The plaintiff, who was a brakeman in defendant's employ, was injured while attempting to couple two freight cars in the dock yards at Hunter's Point on the morning of June 24, 1898, and brings this action to recover damages therefor, alleging that the accident was caused by the defendant's negligence, in not having provided the cars with proper appliances. It is not disputed that the plaintiff's injuries were serious and permanent, and it is admitted that the drawheads with which the two cars were provided were not of the same height, and that the coupling bars or links, which were intended to enter the openings in the drawheads horizontally, could only be inserted at an angle. The plaintiff testified that he was twenty-six years of age and had several years' experience on railroads, and at the time of the accident it was his duty to couple freight cars in the dock yards; that he was standing at the end of a stationary car, waiting for the other cars to come down on the track to him; that they came down slowly, and he noticed that the approaching car held the bar or link which was to connect the cars, and he stood ready with a coupling pin to introduce it into the opening of the drawhead of the stationary car, and drop the pin in place; that just as he was about to do so he saw that the drawhead of the stationary car was about four inches higher than the drawhead of the approaching car, and, thinking he could put the link in all right, he placed his arm underneath the deadwoods or blocks, with which the ends of each car are provided, to protect the drawheads and prevent the car beds from striking, and lifted the link, that it might enter the opening; that as he did this he noticed that the drawhead of the approaching car was loose, and "swagged" from one side to the other, about a foot in all; that his fingers caught between the underside of the link and the flange of the opening of the stationary car, and pulled his arm out straight, so that it was caught between the deadwoods and so mutilated that it had to be amputated. He further testified: That from the time he took hold of the link until he got caught was about three seconds. That "the link held the drawheads apart, partly because of having it on the slant, so that the two drawheads, coming face on, caught the link between them. * * * The force of the car lifted up that low drawhead, and still held my fingers, and straightened my arm right out, and the deadwoods caught me.". That it was generally his custom, when one drawhead was higher than another, to put the link in the higher drawhead, so that the link hung down and entered the opening of the lower drawhead more easily; but ordinarily, the drawheads being level, it was not necessary to do this, or to lift the link. Other witnesses for the plaintiff, who were employed on the road, testified that the drawheads were not of the same height, and that one of them was loose and moved laterally; but they placed the difference in height at only two or three inches, and the lateral movement about the same. They said that it was almost impossible to observe the difference in height when the cars were a few feet apart, and agreed that, in a standard car, there should be no lateral movement of the drawhead; that when there was a difference in height the custom was to put the link in the higher drawhead, but that was a matter of judgment. This testimony, besides that of the physicians as to the extent of the injuries, constituted the plaintiff's case. Motion was made to dismiss the complaint on the grounds: First, that no negligence had been shown; second, that there was no evidence to show that the injury was caused by, or was in any measure due to, any negligence upon the part of the defendant; and, third, that the plaintiff had not shown himself free from contributory negligence. This motion was granted, and the plaintiff's motion to go to the jury was denied. Judgment was thereupon entered dismissing the complaint, and from such judgment the plaintiff appeals.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Thomas P. Wickes, for appellant.
W. C. Beecher, for respondent.

O'BRIEN, J. Our attention is directed by the appellant, upon this appeal, to chapter 544 of the Laws of 1893, which, in section 3, provides:

"That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any railroad or other company to haul, or permit to be hauled or used, on its line or lines within the state, any freight car not equipped with couplers of the master car builder's type, and coupling automatically by impact, and which can be uncoupled, except in cases of accident, without the necessity of men going between the ends of the cars."

So, also, we are referred to similar enactments to be found in section 49, subd. 4, of the railroad law (chapter 565, Laws 1890), in section 424, subd. 2, of the Penal Code, and in certain sections of the interstate commerce act, approved March 2, 1893 (27 Stat. 531). These several statutes were intended to promote the safety of railroad employés, by compelling the equipment of freight cars with automatic couplers; and as they, in terms, all went into effect prior to the date of the accident, which occurred on the 24th day of June, 1898, it would have been entirely competent and proper, upon the question of defendant's negligence, to call attention to them on the trial, and show that defendant had not complied with the provisions. These statutes were neither referred to nor relied upon by the plaintiff at the trial, nor was the attention of the judge called to them. Had that course been followed, the defendant would have been at liberty to rebut the force and effect of the alleged violation by evidence, if it existed, that the statutes had been repealed or modified, or their time for taking effect extended, or other evidence might have been given to excuse the failure of the defendant to comply with the statutes. It has never been held that the violation of a statute is conclusive, but only prima facie, evidence of negligence. Had the plaintiff called attention to the statutes, or relied upon them, or asked to go to the jury upon such ground, their bearing upon the question of defendant's negligence would be before us for review. The practical election made by the plaintiff to predicate liability upon a theory other than a violation of these statutes, and the failure to request a submission to the jury on any such ground, make it improper for us to consider the question, which, for the first time in the case, has been raised on this appeal.

We must therefore turn to the record of the trial, and determine therefrom whether the ruling made at the close of the plaintiff's evidence, dismissing the complaint, was right; and this necessarily involves a consideration of whether the plaintiff made out a prima facie case, tending to show that defendant was guilty of negligence, and the plaintiff free from contributory negligence. Even if we assume that the existence of the statutes referred to, together with the evidence presented at the trial (that the drawheads were not in perfect alignment, nor of standard height, and the one on the moving car had, from use or other cause, become defective, as evidenced by its lateral movement), made out a case of negligence on the part

of the defendant, or if we infer that the place where the plaintiff had been assigned to work was dangerous, there still remains the other proposition, which it was incumbent upon the plaintiff to establish, namely, that he was free from contributory negligence. Taking his statement of the situation presented at the time of the accident, it appears that, when the cars were approaching within a few feet, he noticed the defects complained of,—that the drawheads were not of an even height, and that the link was in the lower one, which rendered it a dangerous operation to attempt to couple the cars; and it is impossible to draw any other inference than that the plaintiff, with full knowledge of the danger, assumed the risk. We say "danger" advisedly, because the plaintiff himself testified that he thought he could avert injury by using care, and by placing his arm underneath the drawhead of the approaching car. This drawhead, he discovered when he attempted to raise the link, had a slight lateral motion; and it is therefore important, in considering the question of contributory negligence, to determine whether this tendency of the lower drawhead to move laterally had any bearing upon the accident. We find nothing in the record from which the inference can be drawn that its condition formed all or any part of the proximate cause of the injury. Whether the drawhead was fixed or movable had no connection, so far as appears, with the happening of the accident. This, as we view the testimony, resulted from plaintiff's effort to raise the link in the approaching car so that it would go into the opening of the stationary car. On the coming together of the cars, the link in some way was caught and wedged against the flange of the higher drawhead, thus holding fast his fingers, which would not have happened had the link passed horizontally into the opening of the drawhead of the stationary car. Aside, therefore, from the alleged defect of the drawhead of the moving car, the plaintiff's injury was caused by his attempt to raise the link after he saw the danger, and had the opportunity to avoid it. Instead of doing so, he made the attempt, assumed the risk, and was unfortunately injured. But for his act in attempting to couple the cars, he was in no position of danger. The distinction between the case at bar and the one relied upon by the appellant, of Goodrich v. Railroad Co., 116 N. Y. 398, 22 N. E. 397, 5 L. R. A. 750, is shown by the different situations in which the employés were placed, and the different risks which were respectively assumed. In that case the plaintiff undertook to couple two cars, and, when they were within a few feet of each other, stepped between them for the purpose of inserting the link which was in the bumper of the moving car into the bumper of the stationary car. He testified that when the cars were a short distance apart he discovered that the bumper of the moving car was lower than the bumper of the stationary car, and that he thought that, by raising the link, it would enter the bumper of the stationary car; that he took hold of the link to raise it, but found that it would not enter the opening provided for it, and at that moment the bumper of the moving car passed under the bumper of the stationary car, and in attempting to remove his hand he was caught between the dead-

woods and severely injured. It was held that the question of plaintiff's contributory negligence was one of fact for the jury, for the reasons, as stated in the opinion, 'that:

"He [the plaintiff] testified that when the cars were four or five feet apart he saw that the bumper of the moving car was lower than the bumper of the stationary car. It does not appear that he observed that it would pass under the bumper of the stationary car, or that there was any danger that the deadwoods would come together. On the contrary, he appears to have thought that the coupling could be made with the straight link which was in the drawhead. He had a right to assume that fact, and that the coupling appliances were in good order. It was only at the moment that the cars were about to collide that he discovered his error."

It will be seen that the cause of the accident in that case was the passing of one bumper under the other, and that this danger was one not observed by the plaintiff until it was too late to recede from his dangerous position; and, as said in the opinion, the whole transaction was the occurrence of a moment, and the error of the plaintiff was in estimating the danger that confronted him. Here, however, the danger to be apprehended was apparent to the plaintiff; and that he realized it was shown by his statement that he thought that, with care, he could successfully accomplish the task. The distinction between the two cases is that in the Goodrich Case the injury resulted from a cause that was unexpected and unforeseen until too late to avert it, while in this case the injury resulted from a cause which was not unexpected, but which the plaintiff thought he could surmount by the exercise of care. Had he not assumed the risk of placing his hand and arm in a dangerous position, no injury could have happened to him, because in this case he was perfectly safe between the cars; the accident being caused, not by one bumper passing under the other, but by the plaintiff's effort to raise the link in the drawhead of the moving car into the drawhead of the stationary car, which was some inches higher. This was an unusual course to pursue; the witnesses, including the plaintiff, all testifying that the customary way, where there was a difference in height of the drawheads, was to place the link in the higher drawhead. And the plaintiff's statement, directly bearing upon the question of whether or not he assumed the risk, was that:

"When I began to make the coupling, I then discovered that there was a difference in the height of the two drawheads; but I thought that, with care, I could make the coupling. I thought, if I used a little care with the link, and bending my arm, I could make the coupling without injury to my arm."

This case, in principle, is more like that of Karrer v. Railway Co., 76 Mich. 400, 43 N. W. 370, where it appears that a brakeman, in coupling cars, noticed that the drawbar of one of them had dropped too low to effect the coupling, and, in attempting to raise it with his knee, it slipped, and his hand was caught and injured; and it was held that he assumed the risk, and could not recover. Apart, therefore, from the question of the defendant's negligence, which we have discussed, but not decided, we think that the inference could not reasonably be drawn that the plaintiff was free from contributory negligence.

The other questions raised, as to rulings upon evidence, we have examined, and do not find that the exceptions taken thereto are tenable. We think, therefore, that the disposition made by the trial judge in dismissing the complaint was right, and that the judgment appealed from should be affirmed, with costs. All concur.